**OREGON RSA NO. 6, INC., Plaintiff,**

v.

**CASTLE ROCK CELLULAR OF OREGON LIMITED PARTNERSHIP, a Colorado limited partnership, Cellular Inc., a Colorado corporation, Castle Rock Cellular, Inc., a Colorado corporation, and Pacific Telecom Cellular, Inc., a Delaware corporation, and certain unknown business organization defendants 1–10, Defendants.**

**CV No. 93–20–PA.**

United States District Court, D. Oregon.

Dec. 15, 1993.

**772**

Duane A. Bosworth, Davis, Wright, Tremaine, Portland, OR, Richard J. O'Brien, Gerard D. Kelly, John M. Breen, Sidley & Austin, Chicago, IL, for plaintiff.

Mark A. Turner, Ater, Wynne, Hewitt, Dodson & Skerritt, Portland, OR, for defendants Castle Rock Cellular of Oregon Ltd. Partnership, Cellular, Inc., and Castle Rock Cellular, Inc.

Gregory A. Chaimov, Bruce L. Campbell, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, for defendant Pacific Telecom Cellular, Inc.

## OPINION

PANNER, District Judge.

Plaintiff Oregon RSA No. 6, Inc. ("Oregon RSA") brings this diversity action against defendants Castle Rock Cellular of Oregon Limited Partnership ("CRCO"), Cellular, Inc., Castle Rock Cellular, Inc. ("CRCI"), and Pacific Telecom Cellular, Inc. ("PTCI") to resolve various disputes arising out of a limited partnership agreement. The parties each move for summary judgment on Count II. I grant plaintiff's motion, and deny defendants' motions.

## BACKGROUND

The Crook County RSA Limited Partnership ("Partnership" or "CCRLP") was formed in May, 1989. The general partner was United Telephone of the Northwest ("UTN"), and the limited partners were U.S. West NewVector Group ("NewVector"), CRCO, and an entity that for unknown reasons is variously referred to as Telephone Utilities of Oregon, Inc. ("TUO") and "Telephone Utilities of Eastern Oregon, Inc." Each partner owned a 25% interest in the Partnership.

In 1991, four changes occurred in the membership of the Partnership. First, Telephone and Data Systems, Inc. ("TDS") was substituted as the general partner in place of UTN. This transaction was specifically provided for in § 14.1 of the Agreement. Second, TUO's interest was acquired by Pacific Telecom Cellular of Oregon, Inc. ("PTCO"), with the approval of the other members of the Partnership. Third, NewVector became concerned that its interest in the Partnership might violate antitrust laws. NewVector therefore conveyed its 25% interest to the other partners, but retained an option to repurchase its interest prior to December 31, 1992. Finally, TDS transferred its general partner interest to its affiliate, Oregon RSA, as permitted by § 11.1 of the Agreement. Thus at the end of 1991, Oregon RSA, PTCO, and CRCO each held a one-third interest in the Partnership, subject to the NewVector repurchase option.

In November, 1992, NewVector gave the partners notice that it intended to sell its option to non-partner Pacific Telecom, Inc., grandparent of limited partner PTCO. If Pacific Telecom exercised that option, it would acquire NewVector's 25% interest, in addition to the 25% interest held by its subsidiary, PTCO. In accordance with the right of first refusal described in § 11.1 of the Agreement, the existing partners were given an opportunity to match Pacific Telecom's offer. Plaintiff informed the other partners that it would exercise its right of first refusal. PTCO did the same. CRCO sent the other partners a written waiver disclaiming any interest in purchasing the NewVector option, but several weeks later announced

that it wished to rescind that waiver and exercise the right of first refusal. The validity of that attempted rescission is the subject of Count I.

At about the same time, Cellular, Inc. (grandparent of limited partner CRCO) entered into a secret agreement with PTCI (parent of limited partner PTCO), by which Cellular, Inc. agreed to convey to PTCI all its interest in CRCI and CRCO.[1] When plaintiff learned of that agreement, it notified the other partners it intended to exercise its right of first refusal to acquire CRCO's interest. Defendants countered that plaintiff had no such right, since PTCI was not purchasing a partnership "interest" but rather was purchasing the partner itself, who would technically remain a partner even though CRCO would be controlled by PTCI. Whether that transaction is subject to plaintiff's right of first refusal is the subject of Count II.

## STANDARDS

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Reasonable doubts about the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631

1. Cellular, Inc. also agreed to exercise (on behalf of PTCI) CRCO's rights of first refusal to acquire part of the NewVector option. That agreement might have prompted CRCO's belated attempt to rescind the waiver of its rights to the NewVector option.

2. Plaintiff contends that the right-of-first refusal provision in § 11.1 has been modified by the "Fourth Amendment" to the Agreement. I disagree. Although § 16.1 of the Partnership Agreement gives the General Partner power of attorney to execute routine amendments to the Agreement, that section must be read in conjunction with § 18.1, which provides that:

Except for amendments made in accordance with this Agreement in connection with assign-

(9th Cir.1987). Inferences drawn from the facts are viewed in the light most favorable to the nonmoving party. *Id.* at 630–31. However, a scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

## DISCUSSION

■ The critical language in this Agreement reads as follows:

11.1 *Limitation on Transfer; Right of First Refusal.* The General Partner or any Limited Partner may transfer its Partnership Interest to an Affiliate thereof at any time without any consent or restriction from the General Partner or any other Limited Partner.... Except as provided in the preceding sentence and Section 14.1 of this Agreement, any other sale, exchange, transfer or assignment of the whole or any portion of any Partner's Partnership Interest shall require the prior written consent of the General Partner, which consent shall not be unreasonably withheld. Before the General Partner or any Limited Partner sells, exchanges, transfers or assigns all or any part of its Partnership Interest to a non-Affiliate of such Partner, it shall offer, by giving written notice to the General Partner, that interest to all of the other Partners for the price at which and the terms under which such non-Affiliate has offered in writing to pay for such interest.[2]

ments of Partnership Interests by Partners to their Affiliates and to reflect additional or substitute Partners or changes in Capital Contributions, *this Agreement may not be amended except upon written consent of all of the Partners.*

(emphasis added). Plaintiff may not circumvent this restriction by attaching substantive changes to a ministerial amendment of the Partnership Agreement, and then using its power of attorney to affix the signatures of its partners. In any event, the recital in the Bill of Sale was not intended as an amendment to the existing Partnership Agreement, but merely a recitation of what the parties believed the existing Agreement already provided. Moreover, the term "directly or indirectly" was used in the context of an

The question presented is whether PTCI may acquire CRCO and CRCI, and thereby acquire CRCO's interest in the Partnership, without first offering plaintiff an opportunity to match PTCI's bid in accordance with the right-of-first refusal clause. I believe that question should be answered no, for the reasons set forth in *Perkins v. Standard Oil Co.,* 235 Or. 7, 383 P.2d 107 (1963), and subsequent cases establishing an implied obligation of good faith and fair dealing in the performance of every contract.

### 1. General Principles of Oregon Contract Law:

Under Oregon law, contracts are to be construed to effectuate the objectively reasonable intentions of the parties. *Local 3–7, Int'l Woodworkers of America v. DAW Forest Products Co.,* 833 F.2d 789, 793 (9th Cir.1987) (citing *Van. v. Fox,* 278 Or. 439, 564 P.2d 695 (1977)). *Accord, Miller v. Miller,* 276 Or. 639, 647, 555 P.2d 1246 (1976); *Oregon School Employees Assoc. v. Rainier School Dist. No. 13,* 311 Or. 188, 196, 808 P.2d 83 (1991). The parties' intention is found in the language used and the surrounding circumstances. *U.S. National Bank v. Caldwell,* 60 Or.App. 639, 642, 655 P.2d 180 (1982), *rev. denied,* 294 Or. 536, 660 P.2d 682 (1983). As a general rule, the construction of a contract is a question of law. *Deerfield Commodities v. Nerco, Inc.,* 72 Or. App. 305, 317, 696 P.2d 1096, *rev. denied,* 299 Or. 314, 702 P.2d 1111 (1985). If the court determines that language of a contract is ambiguous, evidence may be admitted relating to the intention of the parties, and that question becomes one of fact. *Id.*

In determining whether a contract provision is ambiguous, the court may consider the circumstances under which it was made, including the situation of the subject and of the parties, so that the judge is placed in the position of those whose language he is interpreting. *Sunset Coatings Co. v. State ex rel. Dept. of Transport.,* 62 Or.App. 53, 56, 660 P.2d 164, *rev. denied,* 294 Or. 792, 662 P.2d 728 (1983). Extrinsic evidence is admissible for that purpose without first having to establish the existence of an ambiguity. *Id. Accord Welch v. U.S. Bancorp Realty & Mortgage Trust,* 286 Or. 673, 690–91, 596 P.2d 947 (1979) (citing *Card v. Stirnweis,* 232 Or. 123, 130, 374 P.2d 472 (1962) (court must put itself in the position of the parties making the contract)); *Deerfield Commodities,* 72 Or.App. at 317, 696 P.2d 1096 (parol evidence may not vary the terms of the written agreement, but it can place the judge "in the position of those whose language is being interpreted.")

### 2. The Intent of the Parties:

The pleadings and briefs depict a cellular telephone industry that is for the most part organized around "families" of companies. One family is headed by communications giant Pacific Telecom, whose wholly-owned subsidiaries include defendant PTCI. PTCI is itself the parent of other subsidiaries, including PTCO and Pacific Telecom Cellular of Wisconsin, Inc. For convenience, I will refer to this as the Pacific Telecom "family".

Defendant Cellular, Inc. heads another family. It too has numerous wholly-owned subordinates, known as "affiliates" in the language of the industry. Defendant CRCI is a wholly-owned subsidiary of Cellular, Inc. CRCI is in turn the general partner and owner of a 51% interest in defendant CRCO. The remaining 49% limited partnership interest in CRCO is held directly by Cellular, Inc. Likewise, plaintiff is part of a family headed by United States Cellular Corp. ("USCC"), and former partner NewVector is part of the U S West family of companies.

Under the Partnership Agreement, a partnership interest may be transferred to an "affiliate" of an existing partner (as defined in § 2.1) without triggering the right-of-first refusal clause. Conversely, if a partnership interest is conveyed to a non-affiliate, then the other partners must be given a chance to match that offer. The clear intent of this

---

option to purchase an interest in the Partnership. Defendants could have construed that term as referring to the distinction between outright ownership of an interest in the Partnership versus ownership of an option to purchase an inter-

est in the Partnership. The recital in the Bill of Sale does not even rise to the level of persuasive evidence of how the partners construed their Agreement.

provision is to allow a partnership interest to be freely transferred within a given "family" of companies, *e.g.*, the Cellular family, but to bar transfer of that partnership interest to someone outside that family of companies without the consent of the other partners.

Such an interpretation of the intent of the contract is entirely consistent with the purpose of a right-of-first refusal clause, which in close corporations or partnerships is commonly used to prevent the intrusion of an uninvited outsider. The right-of-first refusal clause also gives the remaining partners an opportunity to purchase the interest of a selling-partner in proportion to their holdings in the partnership, thus preserving the existing relative proportions of ownership and voting rights (which retain some significance even in a limited partnership).

The Purchase Agreement between PTCI and Cellular, Inc. contemplates that a partnership interest owned and controlled by the Cellular family will become the property of the Pacific Telecom family. Pacific Telecom, through its subsidiaries PTCI and PTCO, will then control a two-thirds interest in the Partnership (or a 60% interest if plaintiff prevails on Count I).

Had defendants contracted to sell the partnership interest to PTCI directly, this transaction would unquestionably have triggered the right-of-first refusal clause in the Partnership Agreement. However, defendants have sought to circumvent that restriction by conveying not just the partnership interest but also the holding companies that Cellular, Inc. created as repositories for that partnership interest. Defendants thus contend that there has been no transfer of the partnership interest, since the interest is still nominally owned by CRCO, even though CRCO has been acquired by the Pacific Telecom family.

The acquisition of CRCO and CRCI is a blatant subterfuge intended to circumvent the right-of-first refusal clause in the Partnership Agreement and deny plaintiff the fruits of its bargain. The only significant asset of CRCO is its interest in the Partnership, and the only substantial asset of CRCI is its 51% interest in CRCO. There is no evidence that either CRCO or CRCI conducts any other business, operates retail stores, employs a sales force or engineering staff, or that they otherwise have any genuine existence other than as the legal entity that holds the partnership interest.

From all indications, PTCI has absolutely no interest in acquiring the companies (CRCO and CRCI) in their own right as operating concerns. Section 6.6 of the Purchase Agreement expressly provides that prior to the closing Cellular, Inc. will remove all the directors of CRCI. PTCO has also filed documents with the FCC (FCC Form 490) which state that PTCO "will acquire control over the entire interest held by CRCO" in the Partnership. PTCI "plans to utilize its subsidiary, PTCO, to hold the sole limited partnership interest in Castle Rock LP [*i.e.*, CRCO] and to hold the stock of the sole general partner in Castle Rock LP [*i.e.*, CRCI]." Thus CRCO and CRCI will continue to exist in name only. Even that may not last for long, for once CRCO is part of the Pacific Telecom family, the partnership interest can be transferred to any member of the Pacific Telecom family (*i.e.*, an affiliate), including PTCO, without triggering the right-of-first refusal clause.

3. *The Implied Covenant of Good Faith and Fair Dealing:*

Defendants make little effort to hide the fact that the sale of CRCO and CRCI is a subterfuge to circumvent the right-of-first refusal clause, but argue that there is nothing this court can do to prevent such an artifice because the Partnership Agreement does not expressly prohibit such a transaction. Plaintiff counters that the term "sells, exchanges, transfers or assigns all or any part of its Partnership Interest" should be broadly construed to encompass the present transaction in order to give effect to the objectively reasonable expectations of the parties.

Oregon courts have long recognized that there is an implied obligation of good faith in the performance and enforcement of every contract. *Best v. United States National Bank of Oregon,* 303 Or. 557, 561, 739 P.2d 554 (1987). *Accord Esso Petroleum Canada v. Security Pacific Bank,* 710 F.Supp. 275,

282 (D.Or.1989); *Messer v. Portland Adventist Medical Center*, 707 F.Supp. 449, 451 (D.Or.1989); *City of Portland v. George D. Ward & Assoc.*, 89 Or.App. 452, 456–57, 750 P.2d 171, *rev. denied*, 305 Or. 672, 757 P.2d 422 (1988); *Warnock v. Bonneville General Agency, Inc.*, 271 Or. 634, 533 P.2d 333 (1975).

That doctrine was first announced in *Perkins*, 235 Or. 7, 383 P.2d 107, which held that a contract between a dealer and supplier prohibited the supplier from directly soliciting the dealer's customers. Such a prohibition was not expressly stated in the contract, but it was necessarily implied by the circumstances. *Id.* at 16, 383 P.2d 107. The court declared that there is an implied covenant in every contract that neither party will do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Id.*

The Oregon Supreme Court has sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties. *Pride v. Exxon Corp.*, 911 F.2d 251, 256 (9th Cir.1990) (Oregon) (citing *Best*, 303 Or. at 563, 739 P.2d 554). The court has singled out subterfuges and attempts to evade the spirit of the bargain as particular evils that violate the obligation of good faith in performance even though the actor believes his conduct to be justified by a strict interpretation of the contractual language. *See Best*, 303 Or. at 563, 739 P.2d 554. *See also* Restatement (Second) of Contracts § 205, *comment d* (1979). Thus under Oregon law an employer may fire an at-will employee for any reason, or for no reason at all, but the employer may not terminate that employee as a subterfuge to avoid paying retirement benefits to which the employee would have become entitled if her employment continued. *Best*, 303 Or. at 564, 739 P.2d 554. *See also Messer*, 707 F.Supp. at 451.

The approach of the Oregon Supreme Court is a sensible one. If in each contract the parties had to expressly describe and prohibit every artifice by which the parties could potentially deprive each other of the fruits of their agreement, then contracts would soon become as long as the tax code, as difficult to interpret, and (like the tax code) still contain innumerable loopholes available to a party that wished to avoid the spirit of its bargain. The better approach, followed by the Oregon Supreme Court, is to treat a contract for what it is—an exchange of solemn promises—and enforce the objectively reasonable expectations of the parties.

The transaction in question here is an artifice intended to thwart plaintiff's legitimate contractual expectation that it would have a right of first refusal before the partnership interest owned by CRCO could be transferred to someone outside the Cellular family of companies. As such, the Purchase Agreement violates the covenant of good faith and fair dealing that Oregon law implies in every contract.[3]

In light of my ruling, it is not necessary to determine whether the transaction would also violate the express terms of the contract apart from the implied covenant of good faith. I would note, though, that the construction urged by defendants would render the right-of-first refusal clause illusory. Any partner could circumvent that clause by merely (1) creating a holding company for the partnership interest (which would be considered an affiliate); (2) formally substituting the holding company as a partner; and (3) conveying the holding company to the third party buyer. Compliance with the right-of-first refusal clause would thus be entirely voluntary. Surely that was not the intent of the parties when they drafted this section. That this artifice would also be available to plaintiff is a dubious answer.

4. *Schedule 3.12 and Form 10–Q:*

My determination that defendants have acted in bad faith is buttressed by the following excerpt from the Purchase Agreement between defendants PTCI and Cellular, Inc., which conclusively establishes that defen-

---

**3.** I do not hold that a transfer of an interest in Cellular, Inc. would trigger the right-of-first refusal clause in § 11.1. Cellular, Inc. is a publicly traded corporation with many shareholders. My ruling is limited to the particular transaction presented here.

dants believed this transaction was subject to plaintiff's right of first refusal:

## SCHEDULE 3.12 CONSENTS AND APPROVALS

Consents and approvals are required from [banks]. In addition, the partners of Snake River Cellular of Oregon Limited Partnership, Castle Rock Cellular of Oregon Limited Partnership and [redacted] Limited Partnership must either waive their rights of first refusal or consent to the transfer of interest in their respective partnerships.

Defendants now argue that this clause was referring to the right of first refusal of the partners *within* the named partnerships, as opposed to the rights of the other members of the various partnerships (such as CCRLP) in which the named partnerships are themselves partners. I disagree. The plain language refers to the partners *of* CRCO, not the partners *in* CRCO. Moreover, the only partners "in" CRCO are defendant Cellular, Inc. and Cellular's wholly owned subsidiary, defendant CRCI. Surely Cellular, Inc. did not doubt its ability to obtain waivers from its wholly-owned subsidiaries. Schedule 3.12 obviously contemplated waivers and consents that would be needed from a third party.[4] Defendants have also not explained how this transaction would trigger any right-of-first refusal clause involving the partners "in" CRCO, namely CRCI and Cellular, Inc.

4.  Schedule 3.12 states that the other partners of the named partnerships must *"either* waive their rights of first refusal *or* consent to the transfer of interest in their respective partnerships."* (emphasis added). At first glance, that conjunctive language appears to undermine the inference that defendants were acknowledging plaintiff's right of first refusal. However, consent to the transfer of an interest in the Partnership is required only when an interest changes hands. Defendants' entire case is built around the argument that the interest did not change hands. If defendants are correct, then no consent to transfer would have been required in order to consummate this transaction. Accordingly, the "either/or" language does not in any way detract from the significance of Schedule 3.12. Moreover, although the sentence employs an "either/or" dichotomy, there are in fact two different rights discussed here, and they are not mutually exclusive. Notwithstanding whether a partner waives its right of first refusal, it must also consent to the transfer of the interest and admis-

I also note that Schedule 3.12 is the only section in the entire Purchase Agreement that discusses rights of first refusal. Defendants have acknowledged that the Purchase Agreement did trigger the right-of-first refusal clause in the Oregon RSA # 3 Purchase Agreement, of which Snake River LP is a limited partner. This Purchase Agreement contemplates the transfer of the interest owned by Snake River LP. Accordingly, if the language in Schedule 3.12 is to be construed as referring only to the rights of the partners *in* Snake River LP, then the Purchase Agreement is completely silent as to the acknowledged rights of first refusal of the partners *of* Snake River LP. It is inconceivable that defendants would have entered into this transaction knowing that it could be nullified if the partners *of* Snake River LP exercised their rights of first refusal, yet not mention that contingency anyplace in their agreement, even while providing for improbable contingencies such as the exercise of rights of first refusal by the partners *in* Snake River LP. Common sense suggests this section refers to the rights of first refusal by the partners *of* Snake River LP, CRCO, and the other named partnerships.[5]

Cellular, Inc., as a publicly traded corporation, was obliged to disclose material facts concerning the Purchase Agreement in its Form 10–Q filed with the SEC. Cellular, Inc. reported that:

sion of a new or substitute partner, though that consent may not be unreasonably withheld.

5.  When defendants provided plaintiff with a redacted copy of the Purchase Agreement, they ordinarily deleted just the names of the other participants to the transactions, and any confidential information. Schedule 3.12 was treated differently. Defendants redacted the entire schedule—even the number and heading were concealed. This Schedule came to light only after I reviewed an unredacted copy of the Purchase Agreement *in camera* and ordered defendants to provide plaintiff with a copy of Schedule 3.12. There were only two sections in the Purchase Agreement that contained language which might seriously prejudice defendants' case. The potentially incriminating language in the other section (4.9) was similarly withheld by defendants and belatedly provided to plaintiff only after its existence was disclosed during a deposition.

In October 1992, the Company entered into an agreement pursuant to which the Company agreed to transfer the Company's interest in four affiliates which hold interests in three non-managed RSA markets ... in exchange for a 95% interest in an MSA market.... *Transfer of certain of the interests are subject to rights of first refusal held by the remaining partners in the respective partnerships....*

Form 10–Q at 12 (emphasis added). The term *"remaining* partners in the respective partnerships" leaves no doubt that the rights of first refusal are those of plaintiff and the other members of the respective partnerships. Indeed, the Form 10–Q goes on to use the *exact same language* to describe the NewVector deal, which admittedly triggered plaintiff's rights of first refusal: "Transfer of certain of the interests are subject to rights of first refusal held by the remaining partners in the respective partnerships." Form 10–Q at 13.[6] Contrary to defendants' assertions, this language could not have been referring to the rights of the partners *in* New-Vector, *because NewVector is not a partnership.* It is thus clear that the language in Schedule 3.12 and in Form 10–Q refers to the rights of first refusal of the partners *of* CRCO, not *in* CRCO as defendants assert.[7]

**5. *Defendants' Objections:***

**A. *Making the Contract the Parties Would Have Made:***

■ Defendants argue that a court may not, under the guise of contract interpreta-

tion, make the contract the court believes the parties would have made. *See, e.g., Booras v. Uyeda,* 295 Or. 181, 193, 666 P.2d 791 (1983). At first glance, there is some tension between this rule and the doctrine of good faith (which gives effect to the objectively reasonable expectations of the parties). However, most of the cases citing this rule are "gap-filler" cases, where the court was being asked to grant specific performance of a contract in which the parties failed to specify a material term. *See generally Genest v. John Glenn Corp.,* 298 Or. 723, 696 P.2d 1058 (1985). The Oregon courts have been wary of determining material terms that the parties failed to agree upon. However, the *Genest* court observed that "[a]lthough we have concluded that the contract was too incomplete to entitle plaintiff to a decree of specific performance, we have had no occasion to address the question of the enforceability of the contract otherwise...." *Id.* at 751, 696 P.2d 1058. In any event, the doctrine of good faith is not a new material term created by the court, but rather a term implied by law in every contract to give effect to the legitimate expectations of the parties that were created by the language of their contract.

■ Defendants also argue that the good faith doctrine cannot be used to contradict the express terms of the contract. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990). How-

---

**6.** I note that Schedule 3.12 does not state that the transfer of an interest in CRCO "may" trigger the right-of-first refusal clause (which is the language used in the Consent to Hypothecation Agreement). Rather, it unequivocally states that the partners of CRCO "must" waive their rights of first approval. Similarly, Form 10–Q does not state that these transfers "may" be subject to rights of first refusal, but rather that they "are" subject to rights of first refusal.

**7.** Defendants object to any discussion of Schedule 3.12 on grounds I may not consider any evidence except the Partnership Agreement. However, the key issue here is whether the transaction contemplated in the Purchase Agreement triggers plaintiff's rights of first refusal under the Partnership Agreement. Central to that inquiry is whether the proposed transaction violates the implied covenant of good faith. I cannot make that determination without examining the con-

tents of the Purchase Agreement, including Schedule 3.12, and the circumstances surrounding the proposed transaction, including admissions contained in FCC Form 490. Defendants also object to any discussion of Form 10–Q. That form is a statutorily mandated admission, which defendants are estopped to dispute the accuracy of. The admissions in Form 10–Q are not being used as parol evidence to interpret the Partnership Agreement, but simply to validate defendants' explanation of statements made in Schedule 3.12. Finally, I note that the contents of the Purchase Agreement, and the admissions made in Schedule 3.12, Form 490, and Form 10–Q, are not disputed facts. Rather, defendants dispute the inferences that can be drawn from those facts. Because I find those inferences could be subject to only one reasonable interpretation, summary judgment is not precluded.

ever, defendants' motion for summary judgment does not rely upon the express terms of the contract but rather the absence of any express prohibition upon the transaction in question.[8] When the contract is silent, the good faith principle may be used to fill the gap. *Id.*

### B. *Separate Entities:*

■ Defendants contend that Cellular, Inc. cannot be bound by the right of first refusal provisions in the Partnership Agreement because Cellular, Inc. was not a signatory to that agreement. I disagree. The notion of a corporation or limited partnership as a legal entity is a fiction created for convenience in conducting business. When that fiction is used for purposes subversive of that policy, the fiction should be disregarded. *Bucyrus–Erie Co. v. General Products Corp.,* 643 F.2d 413, 418 (6th Cir.1981). *See also McIver v. Norman,* 187 Or. 516, 537–38, 213 P.2d 144 (1949); *Palm Gardens, Inc. v. Oregon Liquor Control Commission,* 15 Or.App. 20, 27, 514 P.2d 888 (1973); *First National City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 629, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983). Where one corporation is so organized and controlled and its affairs are so conducted as to make it a mere instrumentality, conduit or adjunct of another corporation, the court may disregard the fiction of a distinct corporate existence in order to prevent fraud or injustice. *Security Savings & Trust Co. v. Portland Flouring Mills Co.,* 124 Or. 276, 288, 261 P. 432 (1928); *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 401–04, 80 S.Ct. 441, 442–44, 4 L.Ed.2d 400 (1960). The corporate structure may not be used to avoid contractual obligations and defeat the legitimate expectations of other parties. *See Vermeer v. Dismantling Contractors, Inc.,* 90 Or.App. 74, 79, 751 P.2d 796 (1987), *rev. denied,* 306 Or. 156, 758 P.2d 347 (1988); *Martinson v. Andrews,* 219 Or. 280, 284–86, 347 P.2d 53 (1959). Although actual fraud is not generally regarded as a prerequisite for piercing the corporate veil, the plaintiff bears the burden of demonstrating that some injustice or inequity will result from recognition of the corporate entity. *United States v. Van Diviner,* 822 F.2d 960, 964–65 (10th Cir.1987).

■ Disregard of the corporate structure is generally viewed as an extraordinary remedy because it strips the shareholders of the immunity which is at the very heart of the corporate fiction. *See Amfac Foods v. International Systems & Controls Corp.,* 294 Or. 94, 103, 654 P.2d 1092 (1982). Here, however, plaintiff does not seek to pierce the corporate veil to impose liability upon the parent corporation but only to treat CRCO, CRCI, and Cellular, Inc. as a single entity for purposes of construing the right-of-first refusal clause in the Partnership Agreement, so that the parent is prohibited from circuitously depriving plaintiff of the benefits of the bargain that was entered into by the subsidiaries. Since that purpose poses no danger to the objectives protected by the corporate fiction, the standard of proof to justify disregard of the fiction of separate corporations is lower than in a comparable case where the plaintiff seeks to impose liability on the shareholders.

No one factor is determinative. That the subsidiary is a wholly-owned subsidiary of the parent, or shares inter-locking directorates, is not of itself conclusive, *Wakeman v. Paulson,* 257 Or. 542, 480 P.2d 434 (1971), but the argument here is far more compelling. Defendants have offered no evidence that CRCO or CRCI are anything more than paper holding companies. At oral argument, defendants conceded that the partnership interest was the only asset owned by CRCO, and were unable to name a single asset held by CRCI apart from its 51% interest in CRCO.

Also instructive is the deposition testimony of Daniel Dwyer, who executed the Partnership Agreement on behalf of CRCO. Al-

---

8. This is not an appropriate circumstance to apply the maxim *inclusio unius est exclusio alterius.* I cannot believe that the parties took pains to include a right-of-first refusal clause in the Agreement for their mutual protection, but then made a deliberate decision to permit subterfuges intended to deny a party those same rights. Application of that maxim might be more appropriate if plaintiff sought to apply the right-of-first refusal clause to the transfer of an interest in Cellular, Inc.

though Dwyer was ostensibly involved in the management of CRCO, he was unable to provide the names of the two partners in CRCO (Cellular, Inc. and CRCI). Dwyer signed the Agreement as "Treasurer", yet stated at deposition that he "was not sure" if he had an officer role in CRCO. Defense counsel then reminded Dwyer that he was Treasurer of the general partner, CRCI, rather than CRCO. Yet Dwyer had previously stated that he did not know for sure whether CRCI was even a partner in CRCO, explaining: "We're involved in 80 different partnerships, a multitude of parties involved in each. So in terms of exact names and exact relationships, there would be some guesswork on my part."

Another manifestation of intermingling is when the board of the parent company begins making decisions that, consistent with the fiction of separate corporations, ought to have been made by the directors of the subsidiary. The Purchase Agreement for the sale of CRCO and CRCI often ignores the nominal separation of identifies, requiring Cellular, Inc. to take actions that could only be taken by CRCO (acting through its general partner, CRCI). For instance, § 4.9 of the Purchase Agreement between Cellular, Inc. and PTCI provides that:

> *Partnership Meetings and Voting.* CI [Cellular, Inc.] and PTC agree to attend partnership meetings and vote for the interests of.... PTC.... CI agrees to exercise, at the discretion of PTC, any available *rights of first refusal which may arise* in ... OR6 [which is another name for the CCRLP] ... and PTC shall reimburse CI for all reasonable costs for such exercise....

In other words, Cellular, Inc. agreed that prior to the closing it would attend meetings of the CCRLP Partnership—of which Cellular, Inc. itself was ostensibly not even a member—and vote for the interests of PTCI (who was also ostensibly not a member of the Partnership). Thus Cellular, Inc. saw no

distinction between itself and CRCO, the titular owner of the partnership interest who would supposedly be casting the ballots, or between Cellular, Inc. and CRCI, the general partner acting on behalf of CRCO. Likewise, Cellular, Inc. agreed to exercise (on behalf of PTCI) any rights of first refusal in the Partnership. However, those rights belonged not to Cellular, Inc. but to CRCO. Again, Cellular, Inc. drew no distinction between its own actions and those of CRCO and CRCI. Defendants have offered no evidence to refute this inference. Accordingly, I view Cellular, Inc. as the real party in interest, and deem CRCO, CRCI, and Cellular, Inc. as a single entity for purposes of the right-of-first refusal clause.[9] To do any different would be to exalt form over substance. *Cf. Engel v. Teleprompter Corp.,* 703 F.2d 127, 134 (5th Cir.1983) (the transfer of stock of parent corporation does not affect ownership of assets held by subsidiary, *where "absolutely no circumstances, factual, legal or equitable would require us to disregard the separate legal existence of the two subsidiaries in question"*) (emphasis added).

### C. The Oregon RSA # 3 Partnership Agreement:

■ Defendants' next argument focuses on a different partnership agreement, which governs the Oregon RSA # 3 Limited Partnership. The Oregon RSA # 3 Agreement contains a right-of-first refusal clause identical to that in the CCRLP Partnership Agreement, except an additional sentence has been added:

> For purposes of this Section 11.1, the sale, exchange or other transfer or assignment, directly or indirectly, of the whole or any portion of (1) the partnership interests of Cellular, Inc., or Snake River Cellular, Inc., in Snake River, or (2) the ownership interests of Midvale Telephone Company, Pine Telephone Company, Eagle Telephone Company and Helix Telephone

9. This holding is limited to the relationship between CRCO, CRCI, and Cellular, Inc. with respect to this particular transaction and its relation to the right-of-first refusal clause. I express no opinion on whether these enterprises should be viewed as a single entity for any other purpose, such as liability to creditors. *See Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d. Cir. 1985) (domination required for piercing corporate veil need be complete only as to the particular transaction at issue).

Company in Snake River Cellular, Inc., shall be subject to the provisions of this Section 11.1 as if such partnership interest or ownership interest was a Partnership Interest in the Partnership and as if Midvale Telephone Company, Pine Telephone Company, Eagle Telephone Company and Helix Telephone Company are Partners under this Agreement.

Defendants argue that the absence of this clause from the CCRLP Partnership Agreement is conclusive evidence that the parties never intended that the transfer of a limited partner itself—as opposed to just the limited partnership interest—would trigger the right of first refusal provision. I disagree.

Defendants rely on *Hudspeth v. Eastern Oregon Land Co.*, 247 Or. 372, 377, 430 P.2d 353 (1967) for the proposition that language contained in one document but omitted in another is presumed to have been deliberately omitted. In *Hudspeth*, the portion of a deed regarding reservation of rights of way contained language binding grantee's "successors and assigns", while another part of the deed regarding reservation of mineral rights contained no such language. The court inferred that the parties had intended to omit that language from the second paragraph.

It is significant that in *Hudspeth*, the paragraphs were from the same instrument, executed by the same parties on the same day. Here, the two partnership agreements were created within days of each other, but the parties to these agreements are not identical. The Oregon RSA # 3 Partnership included a number of companies who were not parties to the CCRLP Partnership. The lawyer for one of those other companies was either wiser (or more paranoid) than his or her counterparts and insisted upon adding language to clarify that issue. In addition, one of the signatories to the Oregon RSA # 3 Agreement was Snake River Cellular of Oregon Limited Partnership, whose partners were Cellular, Inc. and Snake River Cellular, Inc. The latter was owned by Midvale Telephone Company, Pine Telephone Company, Eagle Telephone Company, and Helix Telephone Company. The lines of ownership in the Oregon RSA # 3 Partnership were thus far more complicated than in Oregon RSA # 6, where each partner was wholly owned by a single family. Thus no inference can be drawn from the absence of similar clarifying language in the Oregon RSA # 6 Agreement.

The additional sentence in the Oregon RSA # 3 Partnership Agreement may actually strengthen plaintiff's argument. It is noteworthy that defendant Cellular, Inc., owner of CRCO and CRCI, was either directly or through its subsidiaries a party to both transactions. Neither Cellular, Inc. nor its surrogates objected to the addition of language in the Oregon RSA # 3 Agreement to clarify that the transfer of an interest in a holding company was the equivalent of a transfer of the partnership interest itself. That suggests Cellular, Inc. or its surrogates would not have objected to the addition of similar clarifying language in the CCRLP Agreement. It is also noteworthy that Cellular, Inc. (either directly or through its surrogates) was aware of the potential problem spotted by one of the parties to the Oregon RSA # 3 Agreement, but did not insist that language be added to the CCRLP Agreement clarifying that the right of first refusal did *not* apply in such circumstances.

I also question defendants' assertion that the addition of clarifying language in the Oregon RSA # 3 Agreement is proof that the original language did not encompass such a transaction. The clarifying language could also have been intended to make clear the liberal construction which the parties believed was already included in the Agreement, *i.e.*, lest there be any doubt, a transfer of a partnership interest *includes* the transfer of an interest in the holding company. The inclusion of that language in the Oregon RSA # 3 Agreement also suggests plaintiff's construction of the CCRLP Partnership Agreement is an objectively reasonable one that would be consistent with the expectations of parties to contracts in that industry.

The bottom line is that either side can find support for its position in the Oregon RSA # 3 Agreement. Moreover, the circumstances surrounding the execution of that document are sufficiently different that it sheds little light upon the intent of the parties in drafting the CCRLP Partnership

Agreement. This evidence is of so little probative value that, if this were a jury trial, I would almost certainly exclude it under Rule 403.

#### D. *Collateral Estoppel:*

Defendants contend that plaintiff is collaterally estopped by a recent Wisconsin trial court decision involving a somewhat similar dispute. I disagree. The federal full faith and credit statute, 28 U.S.C. § 1738, requires a federal court to give the same preclusive effect to a state court judgment as that judgment would be given in the state that rendered the judgment. *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). I must therefore apply Wisconsin law governing collateral estoppel.

Under Wisconsin law, the doctrine of collateral estoppel applies only "where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *Landess v. Schmidt*, 115 Wis.2d 186, 340 N.W.2d 213, 219 (App.1983) (emphasis deleted) (quoting *State ex rel. Flowers v. DHSS*, 81 Wis.2d 376, 260 N.W.2d 727, 734 (1978)). *Accord Crowall v. Heritage Mutual Ins. Co.*, 118 Wis.2d 120, 346 N.W.2d 327, 331 (App. 1984).

The Wisconsin case involved a different transaction (the proposed purchase of the capital stock of Eau Claire Cellular of Wisconsin)—and a different partnership agreement (the Eau Claire Cellular Telephone Limited Partnership Agreement)—which was entered into by different parties—on a different date (more than three years prior to formation of the CCRLP)—and was construed under the laws of a different state (Wisconsin). There are also differences in the wording of the critical sections in the two agreements. For instance, the right of first refusal in the Wisconsin agreement applies when a partner "sells" a partnership interest, while the right of first refusal in the Oregon Partnership Agreement applies any time a partner "sells, exchanges, transfers or assigns all or any part of its Partnership Interest", which is arguably more encompassing than the term "sells". The Oregon Partnership Agreement also contains provisions absent from the Wisconsin agreement.

Defendants seek to avoid those distinctions by (1) citing cases holding that any one of these distinctions is by itself not necessarily fatal, (2) by arguing that the parties were in privity because a sister company of plaintiff was involved in the Wisconsin lawsuit, and (3) by minimizing the differences in the wording of the partnership agreements and the laws of the two states. Ultimately, though, defendants' argument collapses under the combined weight of all the distinctions. I cannot say that the issue being litigated here is "identical in all respects with that decided in the first proceeding" and that "the controlling facts and legal rules remain unchanged." I am convinced that a Wisconsin court would decline to apply collateral estoppel under these circumstances. I also note that the Wisconsin court did not consider whether the Wisconsin Partnership Agreement contained an implied obligation of good faith, or how such an obligation might affect the interpretation of that agreement.

#### 6. *Plaintiff's Additional Arguments:*

Plaintiff offers several alternative grounds for finding in its favor. Those arguments mostly rely upon extrinsic evidence of how the parties interpreted their agreement on other occasions, and admissions contained in various documents. Although evidence of the course of performance may be admissible in some instances, my disposition of this case makes it unnecessary to resort to such evidence, particularly when that evidence does not even pertain to the particular transaction at issue here. I also decline to address plaintiff's contention that the language in § 11.2 of the Partnership Agreement referring to a "multi-part or multi-stage transaction" is evidence that the parties intended the right-of-first refusal clause to apply to the present transaction.

#### 7. *Effect Upon Count I:*

My decision on Count II will in all likelihood dispose of Count I as well. If plaintiff and PTCO each exercise their respective rights of first refusal, they will evenly divide

the partnership interest held by CRCO, including any interest CRCO might have in the NewVector option. That outcome would effectively moot the controversy involving the NewVector option. I will therefore give the parties ten days to show cause, if any, why Count I should not be dismissed as moot.

## CONCLUSION

"Oh, What Tangled Webs we Weave, When First we Practice to Deceive."

Plaintiff's motion (# 42) for summary judgment on Count II is granted, and defendants' motions (## 33 and 34) for summary judgment are denied. Plaintiff shall submit a proposed form of judgment. The parties have ten days from the date of this order to show cause, if any, why Count I should not be dismissed as moot.

## ORDER

Plaintiff's motion (# 42) for summary judgment on Count II is granted, and defendants' motions (## 33 and 34) for summary judgment are denied. Plaintiff shall submit a proposed form of judgment. The parties have ten days from the date of this order to show cause, if any, why Count I should not be dismissed as moot.